**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL  DIVISION**

| | |
|---|---|
| **SILVAN WARNICK, individually and as natural parent and Guardian Ad Litem of A.W., a minor; ALANNA WARNICK; CORY WARNICK and MEGAN WARNICK,** | **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | Case No. 2:04CV360DAK |
| v. | |
| **DAN BRIGGS, individually; ELAINE TOTTEN, an agent of the STATE OF UTAH, DIVISION OF CHILD & FAMILY SERVICES (DCFS) in her individual and not official capacity; DETECTIVE CHARLES KIRBY, individually; HOLLY CURTIS, individually, BRANDON WILKERSON, individually; LT. DAN GALLAGHER, individually; THE CITY OF WEST JORDAN; JOHN and JANE DOES,** | |
| Defendants. | |

This matter is before the court on the West Jordan City Defendants' Motion for Summary Judgment and Elaine Totten's Renewed Motion for Summary Judgment.   The court held a hearing on the motions on June 19, 2007.  At the hearing, Plaintiffs were represented by Robert R. Wallace and David R. Maddox.  The West Jordan City Defendants were represented by Steven W. Allred, and Elaine Totten was represented by Joni J. Jones.   Before the hearing, the

court carefully considered the memoranda and other materials submitted by the parties.  Since

taking the motions under advisement, the court has further considered the law and facts relating

to these motions.  Now being fully advised, the court renders the following Memorandum

Decision and Order.

## I.  BACKGROUND

This case is about the alleged violation of a family's civil rights arising out of the removal

of a minor child from the family's home without a pre-deprivation hearing.   The suit is brought

by, Silvan Warnick, individually and on behalf of his minor daughter, A.W, together with his

wife, Alanna Warnick, and his other older children, Cory Warnick and Megan Warnick (the

"Plaintiffs").   They have brought this § 1983 lawsuit against numerous police officers from the

City of West Jordan (the "West Jordan City Defendants") and Elaine Totten ("Ms. Totten"), a

caseworker for the Division of Child & Family Services ("DCFS").   The operative pleading

pertaining to the current motions is the Third Amended Complaint.

## II.  UNDISPUTED FACTS[1]

Sometime between August 19, 2002 and August 22, 2002, A.W., a then thirteen-year-old

girl, was sexually assaulted by her brother-in-law, Andrew Campos ("Campos").  On August 22,

2002, A.W. told her mother, Alanna, about the inappropriate touching, and Alanna reported it to

---

[1]   Plaintiffs did not refer the court to any specific material facts that they claim are in dispute; rather, they simply provided their own allegedly undisputed facts, which does not comport with the requirements of DUCivR 56-1(b).  Technically, under DUCivR 56-1c, all of the Defendants' facts should be deemed admitted for purposes of summary judgment.  However, the court, in conducting its analysis, has made an attempt to evaluate whether Plaintiffs have created a genuine issue regarding any material facts.

the Utah  DCFS.   On August 28, 2004, Defendant Officer Briggs received the DCFS referral to initiate a criminal investigation.   Shortly after receiving the report, Officer Briggs and a DCFS caseworker, Teresa Fowers, met with Alanna and A.W. at the South Valley Children's Justice Center.   Officer Briggs took a complete, electronically recorded/video-taped statement from A.W., outside the presence of her mother.   During this interview, A.W. informed Officer Briggs that she was scared and did not want to see her brother-in-law again.

Also at the August 28 meeting, Alanna advised Officer Briggs that A.W.'s older sister–and wife of the perpetrator–was going to stay in her marriage and that Alanna and her husband, Silvan, supported that decision.  Alanna stated that she did not want charges brought against her son-in-law and that she and her husband had hired an attorney for him.   She explained that the whole family was a victim in this situation–not just A.W.   Alanna further disclosed to Officer Briggs that, after learning of the sexual assault, she had allowed Campos to be in the house to pick up some papers, but that she did not think that A.W. had seen him.

Two days later, on August 30, 2002, Alanna again spoke with Officer Briggs, at which time he wanted to conduct further interviews.   Alanna told Officer Briggs that she was contacting their lawyer and would get back to him.  She also advised Officer Briggs that she did not like the way he was "going after" her son-in-law and that she did not intend to allow A.W. to testify against him.  She also explained that she was also encouraging A.W. to forgive the perpetrator so that the family could be kept together.

Based on this telephone conversation and his previous conversation with Alanna, Officer Briggs concluded that Alanna may be engaged in witness tampering and was not providing A.W.

with adequate protection from the perpetrator.   That evening, Officer Briggs contacted Assistant

Attorney General Julie Lund with the Child Protection Division for legal advice.   Officer Briggs

had worked with Ms. Lund on several occasions and knew that child abuse cases were within her

professional assignment.   Officer Briggs related the facts and circumstances involving A.W. to

Ms. Lund.   Although there is some dispute as to the characterization of Ms. Lund's statements,

there is no dispute that Ms. Lund said something to the effect of "you, law enforcement, can

remove the child if you feel like that's what needs to happen here."   She also recommended

placing A.W. with a relative, if possible.

    That evening, Officer Briggs, along with the other WJC Defendants and Ms. Totten

went to A.W.'s home.[2]  No one answered the door and a neighbor advised Officer Briggs that the

family had left about thirty minutes before and appeared to be going to dinner.  The officers

decided to wait at the home until the Warnicks returned from dinner.

    Officer Briggs then asked another officer to contact a neighbor, Tiffanie Kirberg, to see if

she knew whether Cory or Megan, A.W.'s siblings, had been seen with Mr. and Mrs. Warnick

when they left for dinner.  Between 9:00 and 9:30 p.m., Officer Briggs was informed that Cory

Warnick, the adult son of Silvan and Alanna Warnick called the neighbor, Ms. Kirberg, from

phone number 913-0692 and asked what was going on.  Ms. Kirberg stated that she did not know

---

[2]  The West Jordan City Defendants and Ms. Totten have not provided any clear evidence
about the timing of Ms. Totten's arrival at the Warnick residence or about whether she
participated in the conversation with Ms. Lund–and if not, when she learned of Officer Briggs'
conversation with Ms. Lund.   The court finds that this ambiguity is not material to the resolution
of Plaintiffs' claims.   Ms. Totten's involvement is discussed more specifically below.

because no one would tell her what was going on.   According to Ms. Kirberg, while Cory was

talking to her, Silvan Warnick took the phone from his son and also asked what was going on.

Ms. Kirberg again told him she did not know and asked Silvan if he knew anything about what

was happening.   Ms. Kirberg then heard Alanna state, "they're looking for A.W., they're looking

for A.W."   Silvan then said, "we'll call you later," and he hung up the phone.

 At approximately 10:00 p.m., Cory and Megan Warnick returned home.   Officer Briggs

asked them both if they knew where their parents were.   Both Cory and Megan stated that their

parents had left town with A.W. and that neither of them knew where they were going or if there

was any way to contact them.   At that time, Cory and Megan did not know that the neighbor had

already told the police that Cory had recently called her and that he had been with his mother and

father.   Cory stated that he had not seen his parents and A.W. since earlier in the day, and that he

did not know where they were.   He said that he knew that they had left town sometime between

noon and seven-thirty in the evening.   Cory was asked several more questions about his parents'

location.   Cory stated that they could be anywhere and there is no specific place they go when

they leave town.   He then stated that the last time he saw his parents and A.W. was at about four-

thirty that afternoon.   When confronted with the inconsistencies, Cory declined to provide any

further responses.   Cory also stated that he knew of no way to contact his parents.

 When Ms. Kirberg had told the officers about the phone call, she stated that she believed

the telephone number, 913-0692, which appeared on her caller identification, belonged to Megan

Warnick.   Officer Briggs then called that number, and the cell phone on Cory's belt began

to ring.   The caller ID on Cory's phone verified that the incoming call was from Officer Briggs.

Cory and Megan were then advised that the officers knew they were lying, and they were informed that they could tell the officer the truth or be arrested for obstruction of justice. Neither Cory nor Megan changed their story.  Megan stated that she did not know her parents' cell phone number, and if she did, it would not matter because the battery was dead.   Cory and Megan were then taken into custody and subsequently given South Jordan citations for obstruction of justice.

Officer Briggs was aware that Cory was a Category II peace officer employed as a constable, and he was aware that constables frequently carry firearms.  After placing Cory and Megan in custody, a protective search for weapons was performed.   During the search, a cell phone was found on Megan.  The officers checked the phone and found a listing for Silvan Warnick under "Dad's Cell Phone."

Soon after they were placed under arrest, Megan Warnick admitted that she and Cory had gone out to dinner with their parents and A.W. at the Hometown Buffet.   Officer Briggs called the number for "Dad's Cell Phone" and Alanna Warnick answered the phone.   Officer Briggs informed her that they had just arrested Cory and Megan for obstructing justice.  Alanna then put her husband on the phone.

Officer Briggs again explained that Cory and Megan had been arrested.  Mr. Warnick stated then that although he had been leaving town, he would be home with A.W. in sixty to ninety minutes.   He further stated that he did not know that anything was going on and that he had contacted an attorney who would be representing him and his family.  Within minutes, Officer Briggs then received a phone call from a person identifying themself as Silvan Warnick's

6

attorney, Phil Dyer, and requesting to know what was taking place.   Officer Briggs explained

that A.W. was the victim of an aggravated sexual abuse perpetrated by a family member, that the

Warnicks were more worried about the suspect than their daughter, and they were not being

appropriate with the victim.  Officer Briggs further stated that as a result of comments made by

Mrs. Warnick, the officers had concerns about the Warnicks' ability to protect A.W.

Officer Briggs further informed the attorney that the Attorney General's office had been

contacted and authorized an emergency removal of A.W. from the home under the

circumstances.[3]   Mr. Dyer indicated that A.W.'s parents would cooperate with the removal and

suggested placement with an uncle, Lemond Warnick.   Shortly after midnight, Silvan and

Alanna Warnick returned home and surrendered  A.W. to DCFS.

Silvan requested to speak with Officer Briggs in private.   He stated that "he was not

aware of what was going on and that his children Cory and Megan had no information about

where they were, and that he didn't even know all the details about the case involving his

daughter A.W. and Campos."

Officer Briggs informed Silvan of the facts leading up to Cory and Megan's arrest and of

the facts regarding the sexual abuse of his daughter.   Officer Briggs also spoke with Silvan about

his concerns regarding Alanna's stated intent to talk to A.W. about forgiving the perpetrator and

---

[3]  Mr. Dyer testified that Officer Briggs told him that he had an "Order" to pick up A.W.
and that if the Warnicks did not cooperate, he would issue an all-points-bulletin for them and
have them arrested for felony fleeing.  Although the substance of this conversation is disputed,
the court does not find that the precise words used here are material to the resolution of the
Plaintiffs' claims.  There is no dispute that Officer Briggs believed, in good faith, that he had
authorization from legal counsel to remove A.W.

refusing to allow A.W. to testify.   Silvan responded that he just did not think his wife understood the situation.

A.W. was then placed at her uncle Lemond Warnick's home pending further court order.   Then, on September 3, 2002, the first business day (due to the Labor Day holiday) after A.W.'s removal, a petition was filed in the Juvenile court by Assistant Attorney General Julie Lund.  This complaint alleged, among other things, that:  The family was informed of [the allegations of abuse] and asked to cooperate to keep Drew [Andrew] away from A.W. while the investigation was proceeding.   The family allowed Drew to visit the home after learning of these allegations and have indicated an unwillingness to let these allegations cause problems in their family.  The mother has further indicated to law enforcement that A.W. would not be testifying against her brother-in-law.

On September 4, 2004, a Shelter Hearing was held before the Third District Juvenile Court at which hearing the Court found:

1. That the parties stipulated that the preliminary requirements of the Child Welfare Reform Act were met.

2. That there is a substantial danger to the physical and emotional health or safety of the child and that she could not be protected without removal based upon the alleged sexual abuse by her brother-in-law and the perception that her parents were failing to protect her from contact with him.

3. That appropriate relatives were located and they were willing to care for the child.

4. That no services were reasonably available to the caseworker, which if provided to the

child or her parents would have eliminated the need for removal.

Based upon such Findings, the juvenile court concluded:

1. The removal of the child was appropriate and necessary based upon the disclosure of sexual abuse by [sic] A.W., her fear of the perpetrator and the concern that she would not be protected from contact with him.

2. The lack of preventative efforts was reasonable because there was an immediate risk of ham to the child based upon the statements made by the parents to law enforcement and the Division of Child and Family Services caseworkers.

3. It appears to be in the child's best interest to continue custody of her in an out of home placement until a safety plan can be put in place which all parties agree to abide by.[4]

On September 4, 2002, charges were filed against Andrew Campos of three counts of Aggravated Sex Abuse of a Child.   On August 25, 2003, Andrew Campos pleaded guilty to two amended counts of Attempted Sex Abuse of a Child, a third degree felony.

Regarding the specific involvement of Elaine Totten, she was the DCFS caseworker on call the night of August 30, when Officer Briggs decided to remove A.W.   At that time, she had been employed by DCFS for ten years, and she had had extensive training on DCFS policy, procedure, and state of Utah child protection laws and statutes.

On the evening of August 30, 2002, Officer Briggs called DCFS and requested assistance.

---

[4]  It appears from the detailed DCFS Activity Records for this case that Ms. Totten met with the Warnicks on either September 5 or 6, 2002 to agree upon a safety plan so that A.W. could be returned to them.  After the safety plan was put into place at that meeting, Ms. Totten then notified A.W.'s aunt and uncle that A.W. could be returned her family.

DCFS caseworkers are required to respond to a request for assistance from any law enforcement agency.   Officer Briggs told Ms. Totten that he had asked for legal advice from the Attorney General's office, Child Protection Division, and that Julie Lund had advised him that A.W. could be taken into protective custody without a warrant–and that she had suggested placing A.W. with a relative, if possible.

When Ms. Totten arrived at the scene (at the Warnick house), Officer Briggs told her that A.W. had been sexually assaulted by her brother-in-law, that he believed that A.W.'s parents were not protecting A.W., and that he did not know where she was or whether she had been subjected to further contact with the perpetrator.   Officer Briggs also told Ms. Totten about how the parents had hired an attorney for the perpetrator and that they wanted to keep the family together.   Officer Briggs was also concerned that the mother had told A.W. to forgive her brother-in-law and that the mother had stated that she would not cooperate with the investigation of the sexual assault and that she did not want charges filed against him.   She also did not want him to go to jail.   Officer  Briggs also told Ms. Totten that the mother had insisted that A.W. not testify against her brother-in-law.   Officer Briggs stated that A.W. had told him that she was scared of Andrew.   In addition, Officer Briggs told Ms. Totten that the parents had allowed Campos in the home even after they learned of the assault.

At the Warnicks' house that night, Ms. Totten was the individual who, at the request of the officers, took Megan and Cory's cell phones.   She then found their father's number listed on Megan's cell phone.   Ms. Totten believed the police officers had given her a lawful order to assist them in obtaining the number from the cell phone.

Ms. Totten never discussed with Officer Briggs whether A.W. should be placed into protective custody.   Officer Briggs later told Ms. Totten that A.W. would be going to stay with her aunt and uncle, and he asked Ms. Totten to drive A.W. there.   Ms. Totten asked the officers to run background checks on the aunt and uncle, and the checks came back clean.  Ms. Totten asked A.W. if she felt comfortable at her aunt/uncle's house, and A.W. responded that she was comfortable.   Ms. Totten believed that the placement was voluntary and that A.W. was not in the protective custody of DCFS.   Ms. Totten agreed with Officer Briggs' conclusion that A.W. was in imminent risk of harm.   Her concern for A.W.'s safety grew after Cory and Megan had lied to the officers and refused to tell the officers where A.W. and her parents were or how to contact them.

Later that night, Ms. Totten called the initial caseworker on this case, Teresa Fowers, and told her what had transpired.  Ms. Totten stated that A.W.'s placement was voluntary and that A.W. was not in DCFS custody.   She asked Ms.  Fowers to follow up with the case. Subsequently, Ms. Fowers' supervisor concluded that given the circumstances, A.W. was probably taken into DCFS protective custody.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate if the record shows there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.   *Ward* v. *Anderson*, 494 F.3d 929, 934 (10th Cir. 2007); *Trask v. Franco,* 446 F.3d 1036, 1043 (10th Cir. 2006) (quotation and citation omitted).  In addition, the  court considers all evidence in the light most favorable to the non-moving party.  *Ward*, 494 F.3d at 934.

Also, regarding the Defendants' qualified immunity defense, the following framework must be kept in mind:

> When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, who must first establish that the defendant violated a constitutional right.   If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  If, on the other hand, a violation has been shown, the plaintiff must then show that the constitutional right was clearly established. . . .   The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation. . . .

*Id.* (internal quotations and citations omitted).   "If the plaintiff indeed demonstrates that the official violated a clearly established constitutional or statutory right, then the burden shifts back to the defendant" to demonstrate that no material facts remain in dispute.   *Id*. (quoting *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1312 (10th Cir. 2002)).

Qualified immunity generally shields from liability for civil damages "government officials performing discretionary functions . . . insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006) (quoting *Harlow v. Fitzgerald*, 456 U.S. 800, 818 (1982)).   Qualified immunity serves at least three purposes as identified by the United States Supreme Court.  First, qualified immunity protects the public from unwarranted timidity on the part of public officials.  *Id.* at 1134 (quoting *Richardson v. McKnight,* 521 U.S. 399, 408 (1997)).   Second, the doctrine helps "to ensure that talented candidates are not deterred by the threat of damages suits from entering public service."   *Id*. (internal quotation marks omitted). Third, qualified immunity reduces the chance that lawsuits will distract from the performance of

public duties.   The doctrine seeks to balance the protection of constitutional rights and the substantial social costs of imposing liability on public officials. *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).

## IV. DISCUSSION

Defendants contend that this court does not have jurisdiction over several of Plaintiffs' claims under the *Rooker-Feldman* doctrine or, alternatively, that these claims are barred under the doctrine of issue preclusion.   They also argue that even if these claims stand, they are entitled to qualified immunity regarding all of the claims asserted.   Specifically, they argue that there were no constitutional violations, and even if there were, the law was not clearly established. Further, the WJC Defendants argue that, even if the law was clearly established, they acted objectively reasonable in relying on the advice of counsel.   Ms. Totten adds that she acted objectively reasonable by relying on the information given to her by Officer Briggs.

Plaintiffs, however, disagree with all of Defendants' arguments.   A.W., her parents, and her siblings argue that their substantive due process rights were violated by Defendants' actions. In addition, A.W.  contends that she was illegally seized and arrested, and A.W.'s parents also contend that they were illegally arrested (when they were forced to return from their alleged "trip.")   Cory and Megan contend that they were illegally arrested, that excessive force was used in their arrest, and that they were illegally searched.

The arguments pertaining to each of these claims will be addressed in turn below.   Prior to beginning its analysis, however, the court reiterates the view cogently expressed by the Tenth Circuit regarding cases such as this one:

13

> Few decisions by state officials are as wrenching as the decision to remove a child from a home based on suspicion of [] abuse.  The competing constitutional interests are so powerful that courts have struggled to find adequate superlatives. On one hand, the state's interest in shielding children from abuse is "transcendent," *Maryland v. Craig,* 497 U.S. 836, 855 (1990) (internal quotation marks omitted), "compelling," *Globe Newspaper Co. v. Super. Ct. for Norfolk County,* 457 U.S. 596, 607 (1982), "of the highest order," *Palmore v. Sidoti,* 466 U.S. 429, 433, (1984), "of surpassing importance," *New York v. Ferber,* 458 U.S. 747, 757 (1982).   On the other hand, parents' interest in raising their children free from government interference is "essential," *Meyer v. Nebraska,* 262 U.S. 390, 399 (1923), "cardinal," *Prince v. Massachusetts,* 321 U.S. 158, 166, (1944), "an enduring American tradition," *Wisconsin v. Yoder,* 406 U.S. 205, 232,(1972), "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court," *Troxel v. Granville,* 530 U.S. 57, 65(2000).
>
> The state's failure to act on reasonable suspicion of abuse can have unthinkable consequences for the children: physical injury, emotional scarring, a lifetime of recovery, disease, dysfunction, or death. But false positives can carry grave and irreversible consequences as well: anguish for the family, public humiliation, developmental setbacks for the children, distrust, or divorce.

*Arredondo v. Locklear*, 462 F.3d 1292, 1293 -1294 (10th Cir. 2006).  In this case, even though the court ultimately finds that Plaintiffs' claims must be dismissed, the court recognizes the trauma undoubtedly experienced by the Warnick family during this ordeal.   It appears, however, that these Defendants–just like the Warnick family–were attempting to do the best they could do in a very difficult situation.

## A.  Rooker-Feldman

Defendants argue that the court lacks jurisdiction over A.W.'s First Cause of Action for Illegal Seizure and any actions derivative of A.W.'s removal, which would include each family member's claims for alleged violations of substantive due process regarding the family's familial relationship rights.   Defendants claim that the juvenile court's determinations regarding A.W.'s

removal preclude these claims under the *Rooker-Feldman* doctrine.  *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005)  ("The *Rooker-Feldman* doctrine . . . is confined to . . . cases brought by state-court losers complaining of injuries caused by state-court judgments rendered *before* the [federal] district court proceedings commenced and inviting district court review and rejection of those judgments.").   Alternatively, Defendants argue that these claims are barred by the doctrine of issue preclusion.

Specifically, Defendants argue that any claim having to do with A.W.'s removal is, in effect, an attempt to seek federal review of the Juvenile Court's final ruling in the shelter hearing, which is impermissible under the *Rooker-Feldman* doctrine.  They argue that this court does not have jurisdiction because A.W. essentially requests that this court review the same substantive facts as did the Juvenile Court but come to an opposite conclusion.

Plaintiffs, by contrast, contend that the *Rocker-Feldman* doctrine does not apply.  They claim that they are not asking this court to undo the state court judgment and that the injuries about which they complain were not caused by the state court judgment, but by the actions of Defendants prior to the state court judgment.   In addition, Plaintiffs contend (erroneously) that A.W. was the only party to the juvenile court proceeding, so, at most, the *Rooker-Feldman* doctrine would bar her claims, but not the claims of the other family members.

The *Rooker-Feldman* doctrine stems from the holding in two cases—decided sixty years apart— by the United States Supreme Court:  *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).   "The *Rooker-Feldman* doctrine establishes, as a matter of subject-matter jurisdiction, that only the United

States Supreme Court has appellate authority to review a state-court decision." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1075 (10th Cir. 2004); *Bolden v. City of Topeka, Kan.,* 441 F.3d 1129, 1139 (10th Cir.2006) ("The *Rooker-Feldman* doctrine prohibits federal suits that amount to appeals of state-court judgments.").   Therefore, in applying the *Rooker-Feldman* doctrine, the court focuses "on whether the lower federal court, if it adjudicated plaintiff's claims, would effectively act as an appellate court reviewing the state court disposition." *Id.*   The doctrine applies: (1) to those federal claims actually decided by a state court, and (2) to those federal claims inextricably intertwined with a state court judgment. *Id.* at 1075.

        To discern whether the "inextricably intertwined" standard applies, the court evaluates whether the injury alleged by the federal plaintiff resulted from the state court judgment itself or is distinct from that judgment. *Id.* at 1076.   Three related concepts–injury, causation, and redressability–inform this analysis.   In other words, courts analyze this question by asking whether the state-court judgment caused, actually and proximately, the injury for which the federal-court plaintiff seeks redress.   *Id.*

        In this case, the court must determine whether Plaintiffs' claims specifically pertaining to A.W.'s removal (her alleged illegal seizure and her parents' substantive and procedural due process rights right to familial relationships) were inextricably intertwined with the state court judgment.   Although the court is cognizant of the United States Supreme Court's recent admonition that "lower courts have at times extended *Rooker-Feldman* 'far beyond the contours of the *Rooker* and *Feldman* cases,'" *Lance v. Dennis*, 546 U.S. 459 (2006) (quoting *Exxon Mobil*,

16

544 U.S. at 283), the court finds that Plaintiffs' removal-related claims are inextricably intertwined with the juvenile court's determination, and thus, they are barred.

In an unpublished, post-*Lance v. Dennis* case, Tenth Circuit has affirmed district court determinations that a juvenile court's decision precluded a district court's jurisdiction over a plaintiff's claims. *See Bergman v. LaCouture*, 218 Fed. Appx. 749, 2007 WL 521220 at *2 (Feb. 21, 2007); *see also English v. Meacham*, 24 Fed. Appx. 890, 2001 WL 1515856 (Nov. 29, 2001) ("[I]t would be impossible for the district court to issue an order . . . without calling into question the judgment of the state juvenile court.").

Other courts have also applied *Rooker-Feldman* in situations involving juvenile court determinations. For example, in *Bayer v. Monroe County Child Youth Services*, 2007 WL 3034009 (M.D. Pa. Oct. 15, 2007), the court found that the plaintiff's Fourteenth Amendment substantive due process claims were barred by *Rooker-Feldman*. The court found that "[i]n its decision to place the children in protective custody, the state court clearly determined that the government's interest in protecting the children outweighed Plaintiff's liberty interest." Thus, "[t]hese claims are a prohibited call to review the state court's judgment." *Id.* at *5. Also, in *McLean v. City of New York*, 2007 WL 415138 (S.D.N.Y. Feb. 6, 2007), the court found that the plaintiffs' Complaint centered around the loss of custody of their children, and thus, they were "in effect asking this Court to reject the Family Court's findings and reverse its judgment ordering the children's removal from plaintiff's custody." *Id*. at *4. The court determined that the claims were barred by the *Rooker-Feldman* doctrine. *Id.*

In this case, in the claims mentioned above, Plaintiffs are essentially asking this court to

17

find that exigent circumstances did not justify A.W.'s removal without a hearing, thereby

depriving Plaintiffs' of various constitutional rights.  To find that Plaintiffs have stated a

constitutional violation would be in direct contradiction of the juvenile court's determination.

Specifically, during the shelter hearing on September 4, 2002, after a hearing and examination of

various witnesses, the court determined:  That there was a substantial danger to the physical and

emotional health or safety of the child and that she could not be protected without removal based

upon the alleged sexual abuse by her brother-in-law and the perception that her parents were

failing to protect her from contact with him; that appropriate relatives were located and they were

willing to care for the child; and that no services were reasonably available to the caseworker,

which, if provided to the child or her parents ,would have eliminated the need for removal.

Based upon such Findings, the juvenile court concluded:

1. The removal of the child was appropriate and necessary based upon the disclosure of

sexual abuse by [sic] A.W., her fear of the perpetrator and the concern that she would not be

protected from contact with him.

2. The lack of preventative efforts was reasonable because there was an immediate risk of

ham to the child based upon the statements made by the parents to law enforcement and the

Division of Child and Family Services caseworkers.

Thus, this court, if it adjudicated Plaintiffs' claims relating to A.W.'s removal, would

effectively act as an appellate court in reviewing the juvenile court's disposition.   The court

recognizes, however, that there are circumstances in which a juvenile court's determination

regarding a warrantless removal may be challenged, despite the *Rooker-Feldman* doctrine, such

as when the integrity of the evidence used at the shelter hearing is challenged.  *See, e.g., Roska v. Sneddon*, 437 F.3d 964 (10th Cir. 2006).   But there is no such issue in this case.

Accordingly, the court finds that the *Rooker-Feldman* doctrine bars A.W.'s First Cause of Action for Illegal Seizure and the claims that derive from A.W.'s removal, which include the parents' claims for violations of substantive and procedural due process rights regarding their familial relationship rights (portions of the Sixth, Seventh, and Eighth) and the Thirteenth Causes of Action.[5]

**B.      Substantive Due Process Claims**

Although the court has found that it does not have jurisdiction over Plaintiffs' substantive due process claims related to the alleged violation of familial rights because of the *Rooker-Feldman* doctrine, the court finds that, even if it did have jurisdiction, Plaintiffs have failed to establish any substantive due process claims in any event.   In the Sixth through Eighth Causes of Action, A.W. , Alanna, and Silvan, respectively, have alleged that Defendants interfered with their right to travel, thereby denying them their liberty, and that Defendants also denied them their right to the care, comfort, protection, security, and companionship of each other.   In the Ninth and Tenth Causes of Action, Megan and Cory have alleged that Defendants interfered with their right to travel, thereby denying them their liberty, and publicly displayed them as handcuffed prisoners to their neighbors and passers-by in a lengthy, abusive, and humiliating

---

[5]  Because there is no suggestion by Defendants that the juvenile court's decision in this case was a "final order," as required by the doctrine of issue preclusion, the court finds that the doctrine of issue preclusion does not apply.

manner.

As the Tenth Circuit has stated, "'[t]he ultimate standard' for assessing an alleged violation of substantive due process is 'whether the challenged government action shocks the conscience of federal judges.'" *Ward v. Anderson*, 494 F.3d 929, 937 (10th Cir. 2007) (quoting *Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006).   In elaborating on this standard, the Tenth Circuit has stated:

> It is well settled that negligence is not sufficient to shock the conscience.  In addition, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power.   The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.  This is a high level of outrageousness.

*Id.* at 937-38.

Assuming *arguendo* that all of these substantive due process rights are recognized, there is no evidence in this case that the Defendants in this case had a malicious intent or demonstrated extreme arbitrariness in their conduct.  There is no evidence that any of the Defendants misused their power to intentionally or recklessly cause injury to any of the Plaintiffs.  Rather, it appears that a police officer grew concerned about A.W.'s welfare after what he perceived were statements by A.W.'s mother that appeared to minimize the sexual abuse suffered by A.W. and focus instead on helping the perpetrator–the husband of another daughter and father to her grandchild.  These statements gave  Officer Briggs understandable concern that such abuse could happen again.   His–and the other officers'–actions demonstrate those of concerned officers doing their best in a complicated situation to protect A.W.  The evidence also indicates that Ms.

Totten merely believed she was assisting the officers in removing a child and placing her with a relative, pursuant to legal advice.   The court finds that the facts simply do not establish conduct that shocks the conscience, and thus Plaintiffs' substantive due process claims (Sixth through Tenth Causes of Action) are dismissed.

### C.    Procedural Due Process Claim

In the Thirteenth Cause of Action, Silvan and Alanna have alleged an "illegal violation of the freedom of familial and general association," in violation of their due process rights.[6] The Supreme Court has held that under the Fourteenth Amendment, parents enjoy a protected liberty interest "in the care, custody, and control of their children."   *Troxel v. Granville*, 530 U.S. 57, 65 (2000).   State officials therefore may neither permanently terminate parental rights nor temporarily remove children from a home without affording the parents due process of law. *Arredondo v. Locklear*, 462 F.3d 1292, 1297-99 (10th Cir. 2006)

Ordinarily, due process requires that the state provide parents with "predeprivation notice and a hearing"–that is, notice and an opportunity to be heard *before* state officials remove children from the home.   *Id.*  Given the state's powerful countervailing interest in protecting children from abuse and neglect, however, courts have long recognized that "extraordinary circumstances" may justify the state in "postponing the hearing until after the event. " *Id.*   Faced with "emergency circumstances which pose an immediate threat to the safety of a child," the

---

[6]  Again, the court has already found that this claim is barred by the *Rooker-Feldman* doctrine.  Even if this doctrine does not apply, however, the court finds that this claim must be dismissed.

state may "temporarily deprive a parent of custody without parental consent or a court order." *Id.*
at 1298.   For such a procedure to comport with due process, of course, the state must provide a
prompt postdeprivation hearing.

In *Gomes v. Wood,* 451 F.3d 1122, 1129 (10th Cir.2006), the Tenth Circuit Court adopted
a "reasonable suspicion" standard for determining whether emergency circumstances justify the
removal of a child from a home without notice and a hearing.   Under that standard, state officials
must have "'evidence giving rise to a reasonable and articulable suspicion that the child has been
abused or is in imminent peril of abuse.'" *Id.* (quoting *Hatch v. Dep't for Children, Youth &
Their Families,* 274 F.3d 12, 20 (1st Cir.2001)).   Although we give some consideration to
"whether state officials might obtain judicial authorization of the removal without additional risk
to the child," *id.* at 1130-31, we take care not to make this factor the "'single focus' of the
inquiry," *id.* at 1130 (quoting *Doe v. Kearney,* 329 F.3d 1286, 1295 (11th Cir.2003)).   Among
the standards proposed by various courts of appeals, we concluded, this standard best "balances
the interests of the parents, the child, and the state."   *Id.*

In this case, the court finds that the evidence available to Defendants  was sufficient to
create reasonable suspicion that A.W. had been abused and was in imminent peril of abuse.
Although Plaintiffs complain that Officer Briggs had two weekdays (August 28-30) in which he
could have secured a court order, such a contention ignores the fact that Officer Briggs' concern
about A.W.'s safety–while apparent on August 28–did not culminate until Friday, August 30,
after Alanna told him she would no longer cooperate and that A.W. would not testify.   Alanna

then did not call Officer Briggs back, as she said she would.   Therefore, it was until Friday

afternoon (before the long Labor Day weekend) that Officer Briggs concluded the circumstances

poses an immediate threat to A.W.'s safety.   Accordingly, the court finds that there is no genuine

issue of disputed fact to preclude summary judgment on Plaintiffs' claim that their procedural

due process rights were violated.

**D.    *Illegal Arrest Claims***

In her First Cause of Action, A.W. claims that she was illegally seized,[7] and in their

Second and Third Causes of Action, Silvan and Alanna contend that they were illegally arrested,

and in the Fourth and Fifth Causes of Action, Cory and Megan claim that they were illegally

arrested.

The Defendants also argue that A.W.'s fourth amendment rights were not violated

because she was not illegally arrested and seized.  They rely on *Roska*, claiming that the Tenth

Circuit has found the removal statute is not patently unconstitutional and that the juvenile court

in this case found that the criteria for removal without a warrant was justified in this case.

Defendants also argue that the parents were never arrested, and thus have no claim.   In addition,

they argue that Cory and Megan were indeed arrested, but they contend that there was nothing

illegal about the arrest because Officer Briggs had probable cause to believe that an offense had

been committed (obstruction of justice).

The court agrees with Defendants that A.W. was not illegally arrested and seized.   The

_____

[7]  Even if the *Rooker-Feldman* doctrine did not bar this claim, the court finds that it must
be dismissed in any event.

Juvenile Court found–and this court agrees–that the criteria for removal without a warrant was justified in these circumstances.   In addition, the court finds that Silvan and Alanna were not seized or arrested, and thus they have not established a constitutional violation.

Finally, although Cory and Megan were arrested and criminally charged, the court finds that the arrests were not illegal.  When a warrantless arrest is the subject of a §1983 action, the arresting officers are entitled to immunity if the officer had probable cause to believe that the arrestee committed an offense.   *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."  *Id*.  Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity."  *Oliver*, 209 F.3d at 1188.  The court finds that Defendants had probable cause to believe Cory and Megan had violated Utah Code § 76-8-306.   Accordingly, Plaintiffs' First through Fifth Causes of Action are dismissed.

**E.**      ***Excessive Force Claims***

Cory and Megan's Eleventh and Twelfth Causes of Action allege that excessive force was used in violation of the Fourth Amendment.  Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests at stake.  *Tennessee v. Garner*, 471 U.S. 1, 8

(1985) (internal quotation and citation omitted).

Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.   *See Graham v. Connor*, 490 U.S. 386, 396-97 (1989).  Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *id.*, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.  *Id.*; *see also Tennessee v. Garner,* 471 U.S. at 8-9 (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure")

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.   *See Graham v. Connor*, 490 U.S. 386, 396 (1989).  With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," *id.* (*quoting Johnson v. Glick,* 481 F.2d at 1033) violates the Fourth Amendment.   The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation.  *Id.*  at 397.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one:  the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.  *Id.*

In this case, the court finds that the Defendants' actions are "objectively reasonable" in light of the facts and circumstances confronting them at the time.  Therefore, the Eleventh and Twelfth Causes of Action are dismissed.

## F.    *Illegal Search Claims*

In their Fourteenth and Fifteenth Causes of Action, Cory and Megan claim that they were illegally searched, contrary to the provisions of the Fourth Amendment.  Plaintiffs, however, fail to demonstrate that their constitutional rights were violated.

The concept of "protective search" or "protective frisk" was resolved in *Terry v. Ohio*, 392 U.S. 1 (1968).  *See also U.S. v. Mikulski*, 317 F.3d 1228, 1235 (10 Cir. 2003)  ("The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.").   Given that Officer Briggs knew that Cory was a sworn peace officer and that such peace officers frequently are armed, in conjunction with the officer's reasonable suspicion that Cory and Megan were violating the law, Defendants were constitutionally justified in making a protective frisk.  Thus, the Fourteenth and Fifteenth Causes of Action are dismissed.

**G.      Conspiracy Claim**

Having found no constitutional violations or, as discussed below, that qualified immunity shields Defendants from liability, no conspiracy claim may succeed.  *Dixon v. City of Lawton, Okla.*, 898 F.2d 1443, 1449 (10th Cir.1990) (to recover under a § 1983 conspiracy claim, a plaintiff must prove (1) a conspiracy and (2) an actual deprivation of rights).   Accordingly, Plaintiffs' claim for conspiracy to deprive constitutional rights is dismissed.

**H.      Qualified Immunity**

Regarding all of Plaintiffs' claims, the court finds that even if Plaintiffs had created disputed facts about whether constitutional violations occurred and even if they had demonstrated that the rights were clearly established, Defendants in this case are still entitled to qualified immunity because a reasonable officer could have believed [the conduct] to be lawful, in light of clearly established law and the information the officers and Ms. Totten possessed at the time–even in the absence of the information concerning Officer Briggs' conversation with Ms. Lund.  *See Gomes v. Wood*, 451 F.3d 1122, 1136 (10th Cir. 2006); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("[I]f officers of reasonable competence could disagree about the lawfulness of the challenged conduct, then qualified immunity should be recognized.") (internal quotations omitted).

This finding is supported by the polices underlying the qualified immunity doctrine.  *See Richardson v. McKnight*, 521 U.S. 399, 408 (1997) (observing that the doctrine protects the public from unwarranted timidity on the part of public officials, helps to ensure that talented

candidates are not deterred from entering public service, and reduces that chance that lawsuits
will distract from the performance of public duties.).

Moreover, the court agrees with Officer Briggs that Ms. Lund's advice creates an
exceptional circumstance that further justified the removal of A.W. without a court order.
Although Ms. Lund denies that she provided such advice, there is no dispute that Officer Briggs
contacted Assistant Attorney General Julie Lund, who was with the Division of Child Protection
at the Attorney General's Office.  Officer Briggs had worked with Ms. Lund on several occasions
and knew that child abuse cases were within her professional assignment.   Officer Briggs related
the facts and circumstances involving A.W. to Ms. Lund.   According to Ms. Lund, however, she
claims that she did not "give advice regarding whether Officer Briggs was legally justified to take
A.W. from her home."   There is no dispute, however, that Ms. Lund said something to the effect
of  "you, law enforcement, can remove the child if you feel like that's what needs to happen
here."   She also recommended placing A.W. with a relative, if possible.  Whatever label is given
to this "advice," the court finds that it was reasonable for Officer Briggs to have relied on it.

The Tenth Circuit has recognized that reliance on the advice of counsel in certain
circumstances can rise to the level of extraordinary circumstances' sufficient to justify a grant of
qualified immunity.  *Roska v. Peterson*, 328 F.3d 1230, 1253 (10th Cir. 2003).   In another case,
*V-1 Oil*, the Tenth Circuit listed relevant factors to consider in determining whether the advice of
counsel rose to the level of extraordinary circumstances sufficient to justify a grant of qualified
immunity.  *V-1 Oil Co. v. Wyoming Dep't of Environ. Quality*, 902 F.2d 1482, 1488 (10th Cir.

1990).  The relevant factors include:  (1) how unequivocal and specific the advice was; (2) how complete the information provided to the attorney giving the advice was; (3) the prominence and competence of the attorney; and (4) the time between the dispersal of the advice and the action taken.  *Id.*

Here, Officer Briggs reasonably believed that Ms. Lund's advice was unequivocal.   In addition, although Plaintiffs claim that Officer Briggs did not convey all the information to Ms. Lund, they have failed to point to any material omissions, after having deposed both Officer Briggs and Ms. Lund.   Officer Briggs had worked with Ms. Lund before and knew that this was within her purview.  Additionally, although the timing is not completely clear from the record, it is clear that Officer Briggs acted immediately after receiving the advice from Ms. Lund.   Thus, the court finds that Officer Briggs' (and then the remaining Defendants') reliance on Ms. Lund's advice constitutes an extraordinary circumstance sufficient to justify a grant of qualified immunity regarding the removal-related claims.

Accordingly, the court finds that for two independent reasons, Defendants in this case are entitled to qualified immunity even if Plaintiffs had sufficiently established constitutional violations.

## V.  CONCLUSION

Accordingly, based on the above reasoning, the West Jordan City Defendants' Motion for Summary Judgment [docket # 73] is GRANTED, and all claims asserted against the West Jordan City Defendants are DISMISSED with prejudice.   Also, Elaine Totten's  Renewed Motion for Summary Judgment [docket #124] is GRANTED, and all claims against Ms. Totten are

DISMISSED with prejudice.  With all the claims now having been dismissed, the Clerk of the

Court is directed to enter judgment in favor of Defendants and against Plaintiffs.  Each party

shall bear his/her own costs.

DATED this 30th day of October, 2007.

_____
DALE A. KIMBALL
United States District Judge